**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| DIESEL USA, Inc.,[1] | Case No. 19-10432 (  ) |
| Debtor. | |

**DECLARATION OF MARK G. SAMSON**
**IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Mark G. Samson, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that:

1.      I am the Chief Restructuring Officer (the "CRO") of Diesel USA, Inc., the above-captioned debtor and debtor-in-possession (the "Debtor").  I am also a Managing Director with Getzler Henrich & Associates LLC, a corporate turnaround and restructuring advisory and consulting firm.  I have over twenty-five years of experience in corporate restructuring advisory services for retail, distribution and manufacturing companies, including operations restructuring, business plan analysis, performance improvement, cash and vendor management, bankruptcy consulting and interim management services.

2.      In my capacity as CRO, I have overseen the preparations for the Debtor's chapter 11 filing and have been involved with, among other things, negotiating with certain of the Debtor's key constituencies.  As a result, I am familiar with the day-to-day operations, business, and financial affairs of the Debtor.  I submit this declaration (the "Declaration"): (i) in support of the voluntary petition for relief filed by the Debtor today, March 5, 2019 (the "Petition Date") under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the motions and applications for related relief filed concurrently herewith and discussed herein (collectively,

---

[1]The last four digits of the Debtor's federal tax identification number are 4308.  The Debtor's principal offices are located at 220 West 19th Street, New York, NY 10011.

the "<u>First Day Motions</u>") and (ii) to explain to the Court and other interested parties the circumstances that compelled the Debtor to seek relief under Chapter 11.

3.      I have reviewed the First Day Motions or otherwise had their contents explained to me and, to the best of my knowledge as I have been able to determine after reasonable inquiry, I believe that approval of the relief requested therein is necessary to permit an effective transition into Chapter 11, to minimize disruption to the Debtor's operations and to facilitate a successful reorganization of the Debtor's business.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge and the knowledge I have acquired from those who report to me, consultation with the Debtor's management team, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning the Debtor's operations and financial condition.  Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.  I am duly authorized to submit this Declaration and, if called upon to testify, I could and would testify competently to the facts set forth herein.

**<u>PRELIMINARY STATEMENT</u>**

5.      The Debtor, a wholly-owned subsidiary of Diesel S.p.A., an Italian corporation (the "<u>Parent</u>"), is the United States member of the international Diesel brand family of companies (collectively referred to herein as "<u>Diesel</u>"), which has been at the cutting-edge of fashion for over 40 years.  Since its creation in 1978, Diesel has experienced extraordinary growth and has evolved from being a leading pioneer in denim into the world of premium casual wear, becoming a true alternative to the established luxury market.  From the beginning, Diesel's mission has been to be more than a clothing retailer, but to serve as a cultural icon standing for passion, individuality, and self-expression.

01:24231145.3

6.      Since launching in the United States in 1995, the Debtor has been the exclusive distributor of Diesel products in the U.S. market.  The Debtor purchases its merchandise from the Parent and other third-party suppliers for resale through its full-price retail stores, factory outlet stores, e-commerce platform, and wholesale channels.  The Debtor has carried the Diesel brand and its core philosophy into the U.S. market by providing innovative and high-quality casual fashion worn by individuals embodying its central ethos of originality and self-expression. Despite the expansion into casual wear generally, the Debtor has long been a leader in the United States "5 Pocket" (jeans and trousers) market.

7.      From its founding until the 2008 recession, the Debtor was both iconic and profitable. Unfortunately, however, the Debtor was not spared the effects of the recession or the downturn in the retail industry that followed. Between 2011 and 2014, the Debtor was beginning to see some improvement from the peak recession years of 2008-2010. Since 2014, however, the Debtor's sales have declined precipitously while its losses have mounted. As with other distressed retailers, the Debtor's losses are concentrated at its full-price brick-and-mortar stores.

8.      In addition to the factors plaguing retail in general, the Debtor's recent challenges stem in large part from the long-term effects of certain strategic decisions made by prior management in an effort to effect a post-recession turnaround, including the negotiation and entry into several leases for certain of its stores as well as allocation of capital among the Debtor's operating segments.  While such efforts produced limited short-term results, the long-term effects have been harmful.  The Debtor has engaged with landlords in an effort to reduce its fixed costs and is otherwise working to correct prior operational miscues.

9.      The Debtor cannot continue to sustain the kinds of losses it has suffered in recent years.  The Debtor has managed thus far to cover these losses only as a result of certain limited,

annual contributions from the Parent that are incidental to a tax arrangement that will end on December 31, 2019.  While these contributions have provided the Debtor short-term relief, the Debtor's operations continue to lose money and it has become increasingly clear that a long-term and more fundamental solution is needed for the Debtor to be able to stem losses, continue operating, and preserve jobs.

10.    Despite its recent hardship, the Debtor has retained a loyal customer base and desires to remain in the United States market.  Certain of the Debtor's stores remain profitable as have the Debtor's wholesale and online operations (though in need of growth, as discussed below).  The Debtor has also revamped its management team with new leadership with extensive experience in both the industry and the global Diesel brand, including the addition of Stefano Rosso as Chief Executive Officer in 2017.  The new management team has formulated a new strategic path over the next 3 years (the "Reorganization Business Plan") to restore the Diesel brand in the United States, return the Debtor to its pre-recession profitability, ensure its ability to continue operating in the United States, and preserve hundreds of jobs in addition to creating new ones through opening new stores.  Specifically, the Reorganization Business Plan entails closing certain underperforming and costly stores with significant terms remaining on their leases  (and allowing other leases to expire in the near term by their terms) and reinvesting the resulting cost-savings into:

a)    Optimizing its retail business by (i) relocating certain existing stores and opening new stores in smaller, more cost-effective locations, and (ii) refitting several existing locations to make them more cost-effective by reducing future capital expenditures;

b)    New marketing initiatives aimed at relaunching and consolidating its position as a "5 Pocket" market leader in the United States, including expanding marketing to female customers;

c)    Growing its e-commerce business by, among other things, implementing new marketing initiatives online and improving online product selection; and

d)      Revitalizing its wholesale business and bringing it in line with the new brand marketing direction, including by reintroducing its presence with certain key wholesale partners and improving product buying and placement.

The Reorganization Business Plan will require significant capital investments over the 3-year period.

11.      In response to the recession, prior management attempted to implement an out-of-court reorganization of the business, which, despite producing limited short-term results, unfortunately worsened the Debtor's problems in the long-term rather than solve them.  New management has recognized the need to address the Debtor's more fundamental issues, which, if allowed to continue, will prevent its ability to continue operating as a going-concern.  The Debtor has spent the past year attempting to address these issues outside the context of chapter 11.  Unfortunately, those efforts have been unsuccessful.  Consequently, the Debtor commenced this chapter 11 case to obtain relief from its burdensome unexpired leases and executory contracts in order to revive its brick-and-mortar retail operations, which will allow it the opportunity to implement the Reorganization Business Plan.  The Debtor is currently analyzing its executory contracts and unexpired leases to determine which will be rejected through this Chapter 11 Case, which will be accomplished through the chapter 11 plan of reorganization that was filed on the Petition Date (the "Plan").  Absent the ability to utilize the chapter 11 process to obtain such relief, the Debtor's ability to continue operating would be severely threatened and it would be unable to implement the Reorganization Business Plan, which is crucial to its ability to continue operating as a going-concern.

12.      The Debtor views an expeditious chapter 11 case as essential to maintaining the stability of its business operations and preserving goodwill with its customers, vendors, and other business partners.  With that goal in mind, the Debtor filed the Plan contemporaneously with the

Combined Hearing Motion (as defined below), which proposes the following timeline for the

chapter 11 case (subject, of course, to the Court's availability):

| Event | Proposed Date/Deadline |
|---|---|
| Petition Date | March 5, 2019 |
| Plan Supplement Filing Deadline | March 28, 2019 |
| Plan/Disclosure Statement Objection Deadline | April 4, 2019, at 4:00 p.m. (Prevailing Eastern Time) |
| Assumption or Rejection Objection Deadline | April 4, 2019, at 4:00 p.m. (Prevailing Eastern Time) |
| Plan/Disclosure Statement Reply Deadline (including, to the extent applicable, replies to any Executory Contract Procedures objections) | April 9, 2019 at 4:00 p.m. (Prevailing Eastern Time) |
| Deadline to file proposed confirmation order | |
| Deadline to file brief in support of confirmation | |
| Second Day Hearing and Combined Hearing | April 11, 2019 (Prevailing Eastern Time) |

13.    To familiarize the Court with the Debtor, its business, the circumstances leading

to the chapter 11 filing, and the relief sought in the Debtor's motions and applications filed

herewith, this Declaration is organized as follows:

- Part I sets forth the nature of the Debtor's business and a concise statement of the circumstances leading to this chapter 11 case;

- Part II describes the Chapter 11 Filing and the Plan; and

- Part III sets forth the relevant facts in support of the First Day Motions;

## I.    NATURE OF DEBTOR'S BUSINESS AND CIRCUMSTANCES LEADING TO CHAPTER 11 FILING

### A.    Diesel Brand, History, and Operations

14.    The Debtor, a Delaware corporation launched in the United States in 1995, is a

wholly-owned subsidiary of the Parent, Diesel S.p.A.  The Debtor is the United States member

of the international Diesel brand, an innovative lifestyle and apparel brand founded in Molvena,

Italy in 1978.  Beginning as a leading pioneer in denim, Diesel today continues to specialize in a variety of denim-wear but has expanded its offerings to include a vast array of premium casual clothing and accessories for men, women, and children.   Diesel has likewise expanded geographically, now operating in approximately 85 countries.

15.     The Debtor advertises, markets, and distributes Diesel products and other merchandise through retail, e-commerce, and wholesale channels throughout the United States. As is customary for a company of its size and scale, the Debtor maintains business relationships and enters into transactions with the Parent and other foreign affiliates in the ordinary course of its business.  Specifically, approximately half of the Debtor's merchandise are Diesel products, which the Debtor purchases in the ordinary course of business from the Parent for resale in the United States.  The Debtor purchases its remaining merchandise from various foreign and United States third-party suppliers.  Products purchased from outside the United States (including from Diesel) are shipped to the Debtor by an international freight forwarding company.  The Debtor's domestic supply chain, logistics, and warehousing are handled by Exel Inc. d/b/a DHL Supply Chain (USA) ("DHL"), who delivers the products to DHL's warehouse in Keasbey, NJ (a portion of which the Debtor leases from DHL) and between and among the warehouse, the Debtor's retail locations, and the Debtor's third-party wholesale partners.

16.     The Debtor leases all of its retail store locations, its inventory warehouse[2], and its corporate headquarters, which is located in New York City and owned by a related party.  The Debtor does not own any real property.

17.     The Debtor sells and distributes its merchandise in three channels: (i) brick-and-mortar retail, (ii) e-commerce, and (iii) wholesale channels.

---

[2] The Debtor also leases a second warehouse in New Jersey that is used exclusively for store furniture.

a.    **Brick-and-Mortar Retail**

18.    As of the Petition Date, the Debtor's brick-and-mortar retail operations consists of 28 retail store locations in 11 states[3], comprised of 17 full-price retail stores and 11 factory outlet stores.  In 2018, the Debtor's full-price stores and factory outlet stores generated net sales of approximately $38 million and $34.5 million, respectively, for a total of approximately $72.5 million or approximately 70% of the Debtor's 2018 net sales.  In 2014, those numbers were approximately $83 million (full-price retail) and $42 million (outlet), for a total of $125 million, which comprised 64% of net sales for that year.  In addition, the Debtor's 17 full-price retail stores combined to produce nearly $9 million in consolidated negative EBITDA in 2018.

b.    **E-Commerce**

19.    The Debtor also retails Diesel products on the internet through the Diesel website: https://shop.diesel.com/.  The Debtor's online sales are managed by a third-party e-commerce vendor, who receives, fulfills, and ships customer's online orders from the third-party's warehouse and handles customer service related to the online orders.  In 2018, the Debtor's online sales generated net sales of approximately $12 million or approximately 12% of the Debtor's 2018 net sales.  In 2014, online sales were approximately $8 million, or 4% of that year's net sales.

c.    **Wholesale**

20.    In addition to the retail stores, the Debtor's products are sold through wholesale channels at locations not operated by the Debtor across the United States as well as online.  The Debtor has valuable relationships nationwide with over 200 retailers such as department stores, specialty retailers and boutiques, and other retailers through which its products are sold,

---

[3] The states in which the Debtor operates stores are New York, California, Florida, Massachusetts, Hawaii, Nevada, Virginia, Illinois, Texas, Pennsylvania, and Georgia.

including Bloomingdales, Saks Fifth Avenue, Off 5th, Nordstrom Rack, numerous e-commerce websites such as Amazon.com, and others. While profitable, the Debtor's wholesale operations were drastically scaled back in recent years, as discussed further below. In 2018, the Debtor's wholesale operations generated net sales of approximately $19 million, or approximately 19% of 2018 net sales. In 2014, wholesale represented over $61 million in net sales or approximately 32% of total sales that year.

### d.    Employees

21.    As of the Petition Date, the Debtor employs approximately 380 employees. Approximately 75 are employed at the corporate level, including roles such as human resources, accounting, wholesale operations, and purchasing. The remaining employees are employed across the Debtor's retail store locations, consisting of store managers and retail sales associates. The Debtor is not a party to any collective bargaining agreement and none of the employees are unionized. The Debtor does not have any pension or retiree obligations.

### B.    Debt Obligations

22.    As of the Petition Date, the Debtor estimates that it owes approximately $7.4 million in unsecured trade obligations. The Debtor has been paying all of its trade vendors in the ordinary course of business and is substantially current with respect to its trade obligations. In addition, the Debtor is obligated under an undrawn Irrevocable Standby Letter of Credit dated as of July 2, 2018 (the "Letter of Credit") issued by UniCredit S.p.A. As of the Petition Date, the amount of the Letter of Credit is approximately $2.5 million. The Letter of Credit is partially cash collateralized in the approximate amount of $1.2 million and expires on January 31, 2020.

C.      **Circumstances Leading to Chapter 11 Filing**

a.      **2015-2018: Sustained Operating Losses**

23.     The Debtor's operations have suffered from the same challenges that have plagued the retail industry as a whole in recent years, namely the general downturn in the brick-and-mortar retail industry resulting from the drastic shift in consumer preferences. Unfortunately, however, the Debtor's recent hardship is the result not only of macroeconomic trends, but of certain failed strategic decisions implemented by prior management in an attempt to effect a post-recession out-of-court turnaround of the business.  Specifically, prior to 2015, prior management began employing a real estate strategy that involved substantial investments in its retail stores, including nearly $90 million in capital expenditures across the business between 2008 and 2015 that was primarily allocated to brick-and-mortar stores.  Given the recession and its impact on the retail industry, those investments were ill-timed, excessive, and unfruitful.  For example, the Debtor's store on Fifth Avenue in Manhattan, which opened in 2008 and closed in 2014, by itself received approximately $18 million in capital expenditures during its tenure while generating substantial losses.

24.     Furthermore, in 2015 prior management implemented a strategic initiative that was focused on repositioning Diesel stores and products in premium locations and with premium customers so as to place them side-by-side with other premium fashion brands across the retail, online, and wholesale platforms.  Unfortunately, since its implementation, the Debtor's net sales have significantly decreased while its losses have significantly increased.

25.     The primary means of implementing the 2015 strategy was to reposition the Debtor's full-price retail and outlet stores to "premium", high-profile, and high-visibility locations, which was executed by opening certain new stores and relocating others to "premium" locations while closing others deemed not to fit the new strategic positioning model.  The result

was, despite the losses suffered in connection with the Fifth Avenue store, management's negotiation and entry into several expensive, long-term leases for certain of the Debtor's retail locations, such as the Debtor's "Flagship" store on Madison Avenue, which do not expire by their terms until 2024-2026.  Of course, it was then (and remains today) an inopportune time to make long-term commitments to costly retail leases and the significantly increased lease expenses have not been offset by increased sales, which, in fact, have dropped precipitously.  As mentioned, in 2014 (immediately prior to implementation of the 2015 strategy), the Debtor's full-price retail stores generated total net sales of approximately $83 million.  By 2018, total full price retail net sales dropped to $38 million.  In addition, numerous of the Debtor's stores are producing heavy losses.   The Debtor's unprofitable stores combined to produce negative EBITDA of approximately $10.7 million in 2018, nearly all of which flowed from full-price retail stores.  The Debtor's profitable stores are not enough to off-set the losses, as the 17 full-price stores combined to produce negative EBITDA of approximately $8.7 million in 2018.

26.     The brand repositioning strategy impacted wholesale operations as well.   In addition to opening and relocating its own stores in premium locations, the Debtor began shifting distribution of its products through its other channels in an effort to place the products in similarly premium stores and websites (other than its own).   Related, the Debtor stopped distributing its products to wholesale partners that were deemed not to fit the premium image. The impact of prior management's brand repositioning strategy was a significant slowdown in wholesale operations that current management is working to address through the Reorganization Business Plan.  In addition, the Debtor's wholesale business suffered in recent years due to the substantial amount of "chargebacks" issued by the Debtor's wholesale customers.  As is common in the retail industry, the Debtor provides certain customers with allowances for markdowns,

returns, damages, discounts, and cooperative marketing programs (collectively, the "Chargebacks"). If the Debtor's customers fail to sell the Debtor's products, they generally have the right to return the goods at cost or issue Chargebacks, which are netted against the Debtor's accounts receivable. Due to mounting Chargebacks from wholesale customers, the Debtor was forced to significantly reduce its wholesale activities in recent years. As a result of the brand repositioning strategy and the significant Chargebacks, the Debtor's wholesale net sales dropped from approximately $62 million in 2014 to $19 million 2018.

27.    In addition to economic challenges, the Debtor was the victim of multiple incidents of theft and fraud that together caused additional losses approximating $1.2 million over the past three years. The first instance was a series of thefts of over $900,000 in cash from one of the Debtor's stores between 2016 and 2018. The Debtor detected the theft in April 2018 and believes it to have been committed by a former employee. The Debtor was also the victim of two separate instances of cyber-fraud theft by internet "spoofers" who, posing as one of the Debtor's vendors, submitted two falsified invoices over the course of two months in 2018. The Debtor paid the two invoices totaling approximately $300,000 prior to its discovery of the fraud in early 2019.[4]

28.    In sum, after the 2015 brand repositioning strategy, the Debtor's substantial retail operations have imposed significant cost burdens and, simultaneously, significant declines in sales. The 2015 brand strategy likewise hamstrung the Debtor's wholesale operations by scaling back its wholesale partners to "premium" customers only. Wholesale operations were damaged further by mounting Chargebacks, which led to a further reduction in wholesale activities.

---

[4] The Debtor has made insurance claims and is otherwise considering all of its options, rights, and remedies with respect to both incidents, including with respect to the former employee and the bank with whom the store keeps its operating account. To date, however, the Debtor has yet to recoup any of the $1.2 million in losses.

29.    Around 2012, the Debtor was beginning to see some improvement from the recession years of 2008-2010.  As a result of the foregoing circumstances, however, the Debtor's operating losses, excluding any contributions from or royalties paid to the Parent, plunged from a manageable $4 million in 2014 to $27 million in 2015.[5]  As demonstrated below, the losses have continued:



| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales | $195 | $187 | $197 | $213 | $221 | $215 | $195 | $152 | $143 | $131 | $104 |
| Loss (EBIT) | ($18) | ($26) | ($16) | ($3) | 0 | ($9) | ($4) | ($27) | ($41) | ($30) | ($24) |

---

[5] Operating losses discussed herein are calculated prior to accounting for contributions and capital infusions received from the Parent as well as royalties paid to the Parent.

| Annual Net Sales by Channel (USD/000) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total Sales | | Wholesale | | Retail & Outlet | | On-line | |
| 2008 | 194,565 | 100% | 65,762 | 34% | 123,883 | 64% | 4,920 | 3% |
| 2009 | 186,921 | 100% | 61,923 | 33% | 119,508 | 64% | 5,490 | 3% |
| 2010 | 196,899 | 100% | 67,625 | 34% | 122,656 | 63% | 6,618 | 3% |
| 2011 | 212,521 | 100% | 70,547 | 33% | 133,605 | 63% | 8,370 | 4% |
| 2012 | 221,279 | 100% | 72,976 | 33% | 138,190 | 62% | 10,112 | 5% |
| 2013 | 214,834 | 100% | 65,866 | 31% | 139,320 | 65% | 9,648 | 4% |
| 2014 | 195,107 | 100% | 61,569 | 32% | 125,148 | 64% | 8,390 | 4% |
| 2015 | 152,246 | 100% | 46,401 | 30% | 97,311 | 64% | 8,534 | 6% |
| 2016 | 143,002 | 100% | 38,896 | 27% | 93,208 | 65% | 10,898 | 8% |
| 2017 | 131,088 | 100% | 35,506 | 27% | 83,879 | 64% | 11,703 | 9% |
| 2018 | 104,212 | 100% | 20,273 | 19% | 72,551 | 69% | 11,388 | 11% |

### b.    New Management and the Reorganization Business Plan

30.    In 2017, the Debtor replaced the prior CEO with Stefano Rosso.  The Debtor has made additional management changes since then, including the appointment of a new Chief Financial Officer in July 2018.  During the year leading up to the filing of this chapter 11 case, the Debtor's new management engaged in the process of reevaluating its business in an effort to curtail losses and return to pre-recession profitability, ultimately formulating the Reorganization Business Plan to be implemented between 2019 and 2021.[6]  After the Debtor's failed attempts to address its issues outside of bankruptcy and recognizing prior management's inability to do the same, the Debtor's current management has determined that a chapter 11 filing to shed burdensome contracts and long-term leases is a necessary prerequisite for implementing the Reorganization Business Plan. The Debtor's projections indicate that the Reorganization Business Plan will return the Debtor to stand-alone profitability by 2021 assuming successful store closures through this Chapter 11 Case, thereby ensuring its ability to continue operating as a going-concern, saving over 300 jobs, and creating new ones through the new store openings.

---

[6] In addition, new management has substantially reduced capital expenditures.  In 2015, the Debtor spent nearly $10 million in capital expenditures on its retail and outlet stores.  In 2018, that number was less than $700,000.

### i. Retail Store Optimization Efforts

31.     Over the past year, management has evaluated its brick-and-mortar operations on a store-by-store basis to determine where and how to most effectively employ its capital and, conversely, which locations represent the greatest drag on profitability.  In an effort to curb costs resulting from its unprofitable leases, the Debtor's management began reaching out to its landlords in January 2018 to attempt to negotiate rent concessions and/or consensual lease terminations.  Unfortunately, the Debtor has obtained no early closures and only a single rent concession from one of its landlords.  As discussed in greater detail below, the Debtor has determined that closing certain expensive, long-term, and underperforming stores as well as obtaining relief from other burdensome executory contracts is crucial to its ability to continue operating.  With my oversight and assistance, the Debtor is currently analyzing all of its executory contracts and unexpired leases and will determine which to reject through the Plan.  In addition, the leases for several underperforming locations will expire by their terms in 2019 and the Debtor does not intend to renew such leases.

32.     In addition, the Debtor's retail optimization plan for 2019 involves (a) relocating certain existing stores to smaller, more cost-effective locations with reduced rents, (b) implementing a "refitting" of certain of its stores, which involves modifications to and replacements of the furniture and fixtures at the stores to make them more cost-effective, thereby reducing future capital expenditures, and (c) opening a new temporary "pop-up" store in Miami, the lease for which was executed by the Debtor prior to the Petition Date and which is scheduled to open during March 2019.  The Debtor also plans to open certain new stores in strategic locations with market-based rents and to refit additional stores in 2020 and 2021.  In addition, all of the Debtor's stores will undergo re-branding to bring them in line with the new marketing initiatives.  The Debtor's retail optimization is aimed primarily at reducing costs but will also

require significant investments in relocating and refitting existing stores, opening new ones, and hiring new employees at the new stores.

ii.        **New Branding and Marketing Initiatives**

33.       During the late 1990s and early-mid 2000s, Diesel jeans were unquestionably among the most popular premium jeans available in the U.S. market.  A critical component of the Reorganization Business Plan is to implement new marketing initiatives aimed at restoring the brand image by relaunching and consolidating its prior position as a leader in the American "5 Pocket" market.  The new strategy focuses on revamping and reintroducing Diesel's denim products and image represents a marked shift from the previous strategy of merely positioning the brand and its products in perceived "premium" locations.  While the global Diesel brand is working at the design level to further evolve its denim to target the American market, the Debtor is likewise at work to evolve its marketing efforts.  The Debtor is formulating new marketing campaigns to be implemented across all of its channels, including on its website, social media, and at the store-level, to generate a rediscovery of the Diesel brand among American consumers. The new marketing strategy will include, among other things:

(a)       Collaborating with social media "influencers" and other artists and talent to reach new generations of consumers, such as "Millennials" and "Generation Z", with a renewed focus on "5 Pocket" offerings;

(b)       Improving in-store customer experience by offering an improved denim shopping experience, enhancing in-store display and layout, and investing in additional staff training to provide customers with enhanced denim expertise;

(c)       Emphasizing great story-telling across all platforms to convey the brand's history, mission, and what makes it unique it to American customers;

(d)       Improving the Debtor's product offerings by (i) offering denim designs and fit to match current American denim buying trends, (ii) enhancing its denim collection for American female customers, and (iii) increasing product offerings that complement its premier denim products, including sneakers and leather jackets; and

(e)    Improving the Debtor's customer relations management ("CRM") through development, implementation, and management of customer loyalty programs.

34.    The Debtor's new marketing strategy will require significant spending on, among other things, new marketing campaigns, rebranding stores, collaborations with "influencers" and other celebrities, CRM development, and training its current in-store staff and hiring new staff at new locations as necessary to offer customers a superior denim shopping experience.

### iii.    Revamping the E-Commerce Platform

35.    While e-commerce sales have grown modestly since 2015, the Debtor is cognizant that, in light of the current retail climate, a significant investment in further growing the e-commerce platform is necessary.  In fact, the e-commerce platform is the only channel to experience sales growth since 2015, demonstrating the continued strength of the Diesel brand in the United States market.  Thus, a critical component of the Reorganization Business Plan is to further grow the e-commerce business by, among other things, improving and enhancing (a) its mobile site and website usability generally, (b) product photography, (c) online promotions, and (d) product availability online, including  its "omnichannel" offerings (or purchasing items online for store pick-up).   These e-commerce growth initiatives will require significant investment.  In addition, the Debtor is evaluating making its products available on other online luxury and fashion retail platforms.

### iv.    Revitalizing Wholesale Operations

36.    The Debtor's Reorganization Business Plan also aims to revitalize its wholesale operations, which were damaged as a result of the 2015 brand repositioning strategy and the resulting cessation or curtailment of partnerships with "non-premium" wholesale customers as well as the significant Chargebacks issued by wholesale customers in recent years.  The Debtor is implementing measures to grow wholesale between 2019 and 2021 and bring it in line with its

new marketing direction, including, among other measures, (a) re-initiating wholesale partnerships with certain key wholesale partners with whom they previously ceased or scaled back wholesaling activities, (b) focusing on wholesale partners that will facilitate reaching its targeted customer bases, (c) investing in targeted marketing activity at their wholesale partners' stores and websites, (d) negotiating improved floor placement for its products, and (e) tailoring its buying and distribution activities among its wholesale partners to optimize sales through each customer.   The Debtor anticipates that growing its wholesale operations in this manner will require a significant investment over the 3-year period in increased product buying and targeted marketing efforts as well as increased wholesale staff.

37.    The Debtor believes the Reorganization Business Plan will enable the Debtor to restore the Diesel brand as a "5 Pocket" market leader by reducing costs to be reinvested into the foregoing value-adding initiatives, thereby enabling the Debtor to emerge from its recent hardships and continue operating as an iconic and profitable brand in the United States.   The Debtor estimates that, after funding expenses and claims in this Chapter 11 Case, the Reorganization Business Plan will require investment of approximately $36 million over the 3-year period, which, as described below, the Parent has agreed to provide subject to a successful and timely consummation of this Chapter 11 Case.

### c.    Preparing for Chapter 11 and Continued Landlord Negotiations

38.    By the end of 2018, faced with another disappointing year and having not made progress with its landlords, the Debtor undertook planning for a chapter 11 filing while continuing to engage with landlords in an effort to avoid a bankruptcy filing.   The Debtor engaged me as CRO and Arent Fox LLP and Young Conaway Stargatt & Taylor, LLP as bankruptcy counsel.   Since my engagement, I have overseen negotiations with landlords.   While the Debtor sought concessions from numerous landlords, the Debtor focused on negotiating

01:24231145.3

relief with respect to its most costly and underperforming stores that, due to their underperformance and/or costly leases, are having the most depressive effect on the Debtor's ongoing ability to operate.  In 2018, the Debtor's unprofitable stores produced negative EBITDA of approximately $10.7 million in the aggregate.

39.     Both prior to and after my retention, the Debtor engaged in good faith negotiations with its landlords and is not in default under any of its leases.  I discussed consensual lease terminations and other alternatives directly with the landlords for certain of the Debtor's stores that are producing the most significant losses and have offered on the Debtor's behalf buyout payments for early termination, which were rejected or did not receive a response.  Thus, despite good faith negotiations, the Debtor has been unable to reach resolutions with its landlords.

40.     Due to the ongoing heavy losses at certain of the Debtor's stores and lack of concessions from landlords, the Debtor has determined that closing certain unprofitable stores is necessary to its viability going forward.  The Debtor's unprofitable stores represented approximately $10.7 million in consolidated negative EBITDA in 2018.  In addition, the Debtor's aggregate annual rent exceeds $25 million and, given that several of the Debtor's most unprofitable leases extend as far as 2026, keeping them open through expiration of their lease terms would cost the Debtor significant lease expense over the full life of the leases.  Specifically, the Debtor's unprofitable stores would combine to cost over $60 million in total lease expense over their remaining terms.  By contrast, the Debtor's rejection of burdensome unexpired leases and executory contracts through this Chapter 11 Case will substantially reduce its annual operating losses.

41.    Furthermore, the Debtor's ability to operate depends on its license agreement with the Parent (the "License Agreement"), pursuant to which Diesel S.p.A. licenses to the Debtor the exclusive right to distribute Diesel products in the United States and which is currently scheduled to expire on December 31, 2019 just as Diesel S.p.A.'s contributions incidental to the aforementioned tax arrangement will come to end.  As a result, the Debtor's ability to continue operating depends on certain crucial concessions from Diesel S.p.A. as licensor, including its consent to the assumption and renewal of the License Agreement.  Diesel S.p.A. is prepared to provide the necessary concessions along with the additional funding necessary for the Reorganization Business Plan in the approximate amount of $36 million, subject to the Debtor's ability to achieve a timely and successful restructuring through this Chapter 11 Case.

42.    Absent the ability to reject unprofitable unexpired leases and executory contracts through chapter 11, the Debtor would lack the runway and funding necessary to implement the Reorganization Business Plan, which is crucial to the Debtor's long-term viability.  With the relief afforded by the chapter 11 process, however, the Debtor will be able to pays its trade vendors in full and implement its Reorganization Business Plan to return to profitability, continue to employ the vast majority of its employees, and create new jobs through new store openings.

## II.    THE CHAPTER 11 FILING AND THE PLAN

43.    The Debtor commenced this chapter 11 case to obtain relief from certain unexpired leases and executory contracts. The Debtor is continuing to evaluate all of its executory contracts and unexpired leases and will determine which will be necessary to reject through the Plan.

44.    Also contemporaneously herewith, the Debtor filed the Plan and related disclosure statement (the "Disclosure Statement"), which will provide for rejection of unexpired

leases and executory contracts and allow the reorganized Debtor to emerge from chapter 11 and continue operating an optimized retail store portfolio and revamped wholesale and e-commerce platforms.  The Plan will provide for payment in full or reinstatement of all claims in accordance with the Bankruptcy Code, including general unsecured claims.  The Plan will not impair any class of claims or interests and will provide for the assumption of all of the Debtor's executory contracts and unexpired leases other than those to be rejected through the Plan.  Accordingly, all classes are deemed to accept the Plan and therefore no class is entitled to vote.

45.     The Debtor also today filed a motion seeking to schedule a combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan on April 11, 2019, or thirty-seven (37) days after the Petition Date and filing of the Plan and Disclosure Statement. I believe the requested timeline is warranted under the unique circumstances of this case, namely that (a) no solicitation of votes is required given the unimpaired status of all claims and interests under the Plan and (b) all prepetition trade vendor claims will either be satisfied pursuant to the relief requested in the First Day Motions, reinstated, or paid in full upon emergence under the Plan.

46.     Furthermore, I believe it is imperative that the Debtor quickly emerge from chapter 11 in order to minimize disruption to the Debtor's business and avoid the costs associated with more protracted chapter 11 proceedings.  First, a quick emergence will prevent unnecessary disruption to the Debtor's wholesale operations.  During the coming weeks, the Debtor's wholesale customers will be ordering inventory and planning floor space for the 2019 fall and winter seasons.  The Debtor's Chapter 11 Case may cause concern among its wholesale customers, who may choose not to place additional purchase orders from the Debtor for fear of the Debtor's ability to fulfill them.  The Debtor has historically experienced depressed retail

sales during the March to May season and expects that trend to continue in 2019.  In addition, the Debtor will continue to pay rent and otherwise perform under its unexpired leases and executory contracts while it determines which to reject through the Plan.  Although currently available cash is projected to be sufficient for the proposed chapter 11 period, I believe that prolonging the case beyond the proposed timeline, which would be unnecessary given the unique circumstances of the Plan in this case, would impose substantial additional cash burn on the Debtor and disrupt its operations, thereby needlessly impeding its ability to successfully emerge from chapter 11.

## III.    EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[7]

47.    As stated, the Debtor operates in a highly competitive retail sector and currently burdened by significant operating losses.  If the Debtor is to turnaround and transform its business through the chapter 11 process, it is imperative that the Debtor make a seamless transition into chapter 11 to preserve the reputation of its business and the loyalty and goodwill of its customers, suppliers, and employees.  Sales and operations must continue in the ordinary course of business to preserve the value of the Debtor's business and it is imperative that the Debtor receives certain first-day relief to ensure that this case is administered efficiently to reduce administrative expenses and best position the Debtor financially upon the effective date of the Plan.  Accordingly, the Debtor has filed a number of First Day Motions designed to facilitate their transition into, and exit out of, this chapter 11 case.  The Debtor anticipates that the Court will conduct a hearing soon after the Petition Date at which the Court will hear and consider all of the First Day Motions.

---

[7] Capitalized terms used but not defined in this Section III shall have the meanings ascribed them in the applicable First Day Motion.  To the extent of any conflict between this summary and the applicable First Day Motion, the applicable First Day Motion shall govern.

01:24231145.3

48.     I reviewed each of the First Day Motions with the Debtor's counsel, and I believe that the relief sought in each of the First Day Motion is tailored to meet the goals described above and will be necessary and critical to the Debtor's ability to successfully execute a restructuring and is in the best interests of the Debtor's estates and creditors.  A description of the relief requested and the facts supporting each of the pleadings is set forth below.

    **A.**    **Debtor's Motion for Entry of an Order (I) Scheduling Combined Hearing on Adequacy of Disclosure Statement  and Confirmation Of Plan On Shortened Notice; (II) Fixing Deadline to Object to Disclosure Statement and Plan; (III) Waiving Solicitation of the Plan and Approving Manner of  Notice of Commencement, Combined Hearing, and Objection Deadline;   (IV) Approving Notice and Objection Procedures for the Rejection of Executory Contracts and Unexpired Leases; (V) Conditionally (A) Directing the United States Trustee Not to Convene Section 341(A) Meeting of Creditors and (B) Waiving Requirement of Filing Statement of Financial Affairs and Schedules of Assets and Liabilities; and (VI) Granting Related Relief (the "<u>Combined Hearing Motion</u>")**

49.     Pursuant to the Combined Hearing Motion, the Debtor seeks entry of an order:

    (a)    scheduling a combined hearing (the "<u>Combined Hearing</u>") on (a) the adequacy of the *Disclosure Statement for Chapter 11 Plan of Reorganization of Diesel USA, INC.* (as may be amended, supplemented or otherwise modified from time to time, the "<u>Disclosure Statement</u>"), and (b) confirmation of the *Chapter 11 Plan of Reorganization of Diesel USA Inc.* (as may be amended, supplemented or otherwise modified from time to time, the "<u>Plan</u>");[8]

    (b)    establishing the deadline (the "<u>Objection Deadline</u>") to object to the adequacy of the Disclosure Statement and confirmation of the Plan;

    (c)    waiving the need for solicitation of the Plan and approving the manner of the notice (the "<u>Notice Procedures</u>") of the commencement of the Debtor's chapter 11 case, the Combined Hearing, and the Objection Deadline (the "<u>Combined Notice</u>");

    (d)    approving the notice and objection procedures for the assumption of executory contracts and unexpired leases (the "<u>Assumption Procedures</u>");

    (e)    conditionally (i) directing the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") not to convene a meeting of

---

[8] Copies of the Disclosure Statement and Plan have been filed contemporaneously with this Motion.  Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Plan or, if not defined in the Plan, in the Disclosure Statement.

creditors (the "Creditors' Meeting") under section 341(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and (ii) excusing the requirement that the Debtor file a statement of financial affairs (the "SOFA") and schedules of assets and liabilities ("Schedules"); and

(f)     granting related relief.

50.     In connection with the foregoing, the Debtor respectfully requests that the Bankruptcy Court approve the following schedule (the "Proposed Confirmation Schedule"), subject to the Bankruptcy Court's availability:

| Event | Proposed Date/Deadline |
|---|---|
| Petition Date | March 5, 2019 |
| Plan Supplement Filing Deadline | March 28, 2019 |
| Plan/Disclosure Statement Objection Deadline | April 4, 2019, at 4:00 p.m. (Prevailing Eastern Time) |
| Assumption or Rejection Objection Deadline | April 4, 2019, at 4:00 p.m. (Prevailing Eastern Time) |
| Plan/Disclosure Statement Reply Deadline (including, to the extent applicable, replies to any Executory Contract Procedures objections) | April 9, 2019 at 4:00 p.m. (Prevailing Eastern Time) |
| Deadline to file proposed confirmation order | |
| Deadline to file brief in support of confirmation | |
| Second Day Hearing and Combined Hearing | April 11, 2019 at (Prevailing Eastern Time) |

51.     I have been informed that a debtor is typically required to provide notice of a hearing to consider the adequacy of the disclosure statement and a hearing to consider confirmation of a plan to all creditors.  I have also been advised that the Debtor seeks to serve a combined notice of the commencement of this chapter 11 case and the Combined Hearing to all classes of creditors in this chapter 11 case and the U.S. Trustee.

52.     The Combined Hearing Notice sets forth the deadline and procedures for filing objections to the adequacy of the Disclosure Statement and confirmation of the Plan, the manner

in which the Disclosure Statement and the Plan and other pleadings filed in these chapter 11 cases can be obtained or viewed electronically, and a summary of the treatment of each class under the Plan.  In addition, the Combined Hearing Notice will notify parties of procedures with respect to the Debtor's assumption of certain executory contracts and unexpired leases.

53.    I believe that the relief requested in the Combined Hearing Motion is in the best interests of the Debtor's estate, its creditors, and other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Bankruptcy Court should approve the Combined Hearing Motion.

**B.    Debtor's Motion for Entry of an Order Authorizing, but not Directing, Payment of (A) Certain Prepetition Wages, Salaries, and other Compensation and (B) Certain Employee Benefits and other Associated Obligations (the "<u>Employee Wage Motion</u>")**

54.    The Debtor seeks authorization to (a) pay and/or remit, as applicable, (i) the Unpaid Wage Obligations, (ii) the Unremitted Withholdings Obligations, (iii) the Unpaid PTO Obligations, (iv) the Unpaid Reimbursable Expense Obligations, (v) the Unpaid Employee Benefits Obligations, (vi) the Unpaid Employee Insurance Coverage, (vii) the Unpaid Workers' Compensation Claims, and (viii) the Unremitted 401(k) Contributions (together with all costs and fees incident to the foregoing, collectively, the "<u>Employee Obligations</u>") and (b) continue to honor and/or collect, as applicable, (i) the Wage Obligations, (ii) the Withholding Obligations, (iii) the PTO Program, (iv) the Reimbursement Program, (v) the Health Plans, (vi) the Employee Insurance Program, (vii) the Workers' Compensation Program, (viii) the Unpaid Workers' Compensation Claims, and (ix) the 401(k) Plan (collectively, the "<u>Employee Plans and Programs</u>").

55.    The Debtor's workforce consists of approximately 250 hourly wage earners (the "Hourly Employees") and approximately 130 salaried personnel (the "Salaried Employees" and, together with the Hourly Employees, the "Employees").[9]    The Employees are critical to the Debtor's business.  The Employees perform critical functions for the Debtor, including, among many other things, sales, purchasing, accounting, finance, management, supervisory, administrative functions, and customer service.

Compensation and Withholding Obligations

56.    The average bi-weekly payroll for the Debtor's Employees is approximately $800,000, including payroll taxes.  As of the Petition Date, the Debtor estimates that Wage Obligations currently owed in the ordinary course of business do not exceed approximately $475,000.  The Debtor seeks authorization, but not direction, to pay the foregoing Employee Compensation Obligations in an amount not to exceed $12,850 per eligible Employee, and to continue to honor the such obligations on a postpetition basis in the ordinary course during the administration of the chapter 11 case.

Paid Time Off

57.    The Debtor offers certain Employees paid time off ("PTO") in the form of compensation for vacation, personal days, and sick time.  I believe the PTO programs are typical and customary, and continuing to offer them is necessary for the Debtor to retain Employees during the reorganization process.  Because PTO is accrued and used by Employees on a continuous basis, it is difficult to precisely quantify the cost of accrued PTO as of the Petition Date.  However, the Debtor estimates that as of the Petition Date the value of accrued and unpaid PTO does not exceed approximately $150,000.  To the best of its knowledge, the Debtor does

---

[9] The Debtor also employs one temporary employee.  To the extent applicable, the relief sought in the Employee Wages Motion applies to such temporary employee.

not believe that any unpaid PTO obligations are currently due and owing as of the Petition Date. Out of an abundance of caution, however, the Debtor requests authority, but not direction, to pay any unpaid PTO obligations as of the Petition Date solely in accordance with applicable law.

Reimbursable Expense Obligations

58.    Prior to the Petition Date, in the ordinary course of business, the Debtor reimbursed Employees for certain expenses incurred on behalf of the Debtor in the scope of the Employee's employment.  As of the Petition Date, the Debtor estimates that the total amount of unpaid prepetition Reimbursable Expense Obligations does not exceed approximately $5,000. Accordingly, to avoid harming Employees who incurred Reimbursable Expense Obligations, the Debtor requests authority, but not direction, to pay all Unpaid Reimbursable Expense Obligations and authority to continue the Reimbursement Program in the ordinary course during the administration of the chapter 11 case.

Employee Benefit and Insurance Obligations

59.    In the ordinary course of business, the Debtor offers certain Employees medical benefits, including medical, dental, and vision benefits.  The Debtor believes, and I concur, that it is necessary and appropriate to continue to honor its obligations under the Health Plans. Pursuant to the Debtor's medical plan, the Debtor pays approximately $250,000 per month.  As of the Petition Date, the Debtor estimates that its liability under the Health Plans does not exceed approximately $70,000.  The Debtor requests authority, but not direction, to pay all unpaid Employee Benefit Obligations and to continue to offer the Health Plans and honor its obligations thereunder in the ordinary course during the administration of the chapter 11 case.

60.    The Debtor also provides certain standard insurance programs to its Employees. As of the Petition Date, the Debtor estimates that its liability under such programs does not

exceed approximately $10,000.  The Debtor seeks authority, but not direction, to pay the Unpaid Employee Insurance Coverage and to continue to provide the Employee Insurance Program in the ordinary course of business during the administration of the chapter 11 case.

Workers' Compensation

61.    The Debtor maintains a workers' compensation policy that provides the required level of coverage in each state in which the Debtor operates.  The Debtor does not have a deductible or cap under its policy and it pays $15,000 per month in premiums.  As of the Petition Date, the Debtor estimates that it owes approximately $7,500 for premiums due under the Workers' Compensation Insurance Policy.  The Debtor seeks authority, but not direction, to pay any Unpaid Workers' Compensation Claims (regardless of when such obligations arose) and to continue to honor the Workers' Compensation Program in the ordinary course of business during the administration of the chapter 11 case.

Savings and Retirement Plans

62.    The Debtor maintains a 401(k) plan for certain eligible Employees (the "401(k) Plan"), whereby it matches Employee contributions to the 401(k) Plan at the rate of fifty cents for every dollar contributed by an Employee, up to six (6) percent of an Employee's salary.  As of the Petition Date, the 401(k) Plan administrator holds in trust approximately $11.5 million in Employee 401(k) Plan contributions,[10] which includes the Debtor's contribution match (the "Unremitted 401(k) Contributions").  The Debtor requests that it be authorized, but not directed, to remit the Unremitted 401(k) Contributions and to continue to operate the 401(k) Plan in the ordinary course of business.

---

[10] This amount includes amounts contributed by employees of the Debtor's affiliates.

63.     I believe that preserving and maximizing the value of the Debtor's estate depends on a stable workforce.  I believe the Debtor's failure to pay its wage obligations, and to continue to honor, as applicable, employee benefits, would have a material adverse impact on the Debtor's business and the Debtor's ability to maximize value through the prosecution of the chapter 11 case.  Therefore, I believe that the relief requested in the Employee Wages Motion is in the best interests of the Debtor's estate, its creditors, and parties-in-interest and is necessary to avoid immediate and irreparable harm to the Debtor's estate and, accordingly, I submit on the Debtor's behalf that it should be approved.

**C.     Motion for an Order Pursuant to Sections 105(a), 345(b), 363(c) and 364(a) of the Bankruptcy Code Authorizing the Debtor to (I) Continue to use Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Waive Requirements of Section 345(b) of the Bankruptcy Code (the "Cash Management Motion")**

64.     Pursuant to the Cash Management Motion, the Debtor seeks entry of an order: (a) authorizing but not directing the Debtor to (i) continue to use its existing Cash Management System, (ii) maintain its existing Business Forms (defined below), and (iii) waive the requirements of section 345(b) of the Bankruptcy Code to the extent its Bank Accounts contain funds in excess of the amounts insured by the FDIC.  In the ordinary course of business, the Debtor maintains the Cash Management System which consists of nine (9) Bank Accounts[11] at four (4) different banks (the "Banks"), all of which pool into an account maintained at Bank of America, N.A. ("BOA").  With this system in place, the Debtor is able to accurately record collections, transfers, and disbursements as they are made through the various Bank Accounts. The Cash Management System has six (6) main components: (i) cash collection at the store level, whereby the cash and checks from sales at the Debtor's retail stores are deposited into one of

---

[11] Additionally, the Debtor has two inactive Bank Accounts with Deutsche Bank A.G. which were used historically, but are no longer part of the Debtor's Cash Management System and carry a zero balance.

three (3) store accounts (Account Nos. 5332, 1422, 7490) (the "Store Accounts")[12]; (ii) the sweeping of deposits from the Store Accounts, on a daily basis, into a consolidated store account (Account No. 9166) (the "Master Store Account"); (iii) electronic collections from online sales and merchant accounts at retail locations into a concentration account (the "Electronic Deposit Account") (Account No. 2540); (iv) collections from wholesale vendors into a lockbox account (the "Lockbox Account") (Account No. 2553); (v) the sweeping of all funds, on a daily basis, from the Master Store Account, the Electronic Deposit Account, and the Lockbox Account into a concentration account (Account No. 2524)   (the "Concentration Account"); and (vi) a disbursement account (Account No. 0721) (the "Disbursement Account") and payroll account (Account No. 2537) (the "Payroll Account") from which funds are drawn from the Concentration Account for check disbursements, wires, or other methods to satisfy payments in the ordinary course of business to third parties and payroll obligations.

65.    Two (2) of the four (4) Banks are on the Office of the United States Trustee's list of authorized depositories while the other two (2) Banks are not.  However, the accounts at the two (2) Banks which are not authorized depositories carry a daily zero balance, as funds in such accounts are swept daily into accounts at United States Trustee approved Banks.

66.    In addition, to minimize expenses, the Debtor further requests that it be authorized to continue to use its correspondence and business forms, including, but not limited to, purchase orders, invoices, multi-copy checks, letterhead, envelopes, promotional materials, and other business forms (collectively, the "Business Forms"), substantially in the forms existing immediately before the Petition Date, without reference to its status as debtor-in-possession.

---

[12] The Store Accounts consist of two (2) accounts maintained at the Bank of Hawaii Corporation, one for each of the Debtor's store locations in Hawaii, and one (1) account maintained at HSBC Bank USA, N.A. for all of the Debtor's other store locations.

67.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, creditors, and other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11.   Accordingly, on behalf of the Debtor, I respectfully submit that the Bankruptcy Court should approve the Cash Management Motion.

**D.     Debtor's Application Pursuant to 11 U.S.C. § 105(a), 28 U.S.C. § 156(c), and Local Rule 2002-1 for an Order Appointing Bankruptcy Management Solutions d/b/a Stretto as Noticing Agent for the Debtor Effective *Nunc Pro Tunc* to the Petition Date (the "<u>Stretto 156(c) Retention Application</u>").**

68.     Pursuant to the Stretto 156(c) Retention Application, the Debtor seeks entry of an order: (a) appointing Business Management Solutions d/b/a Stretto ("Stretto") as noticing agent (the "<u>Noticing Agent</u>") for the Debtor in its chapter 11 case effective *nunc pro tunc* to the Petition Date, including assuming full responsibility for the distribution of notices and services related thereto.

69.     Based on my discussions with the Debtor's proposed counsel, I believe that the Debtor's selection of Stretto to act as the Noticing Agent is appropriate under the circumstances and in the best interest of the estate.  I received and reviewed bids from three (3) noticing agents and I believe that based on all engagement proposals obtained and reviewed that Stretto's rates are competitive and comparable to the rates charged by their competitors for similar services.

70.     The Debtor anticipates that there will be hundreds of persons and entities to be noticed in this chapter 11 case.  In light of the number of parties in interest, the Debtor submits that the appointment of a noticing agent will provide the most effective and efficient means of, and relieve the Debtor and/or the Clerk's office of the administrative burden of, noticing and is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest. Accordingly, on behalf of the Debtor, I respectfully submit that the Bankruptcy Court should approve the Stretto 156(c) Retention Application.

E.      **Debtor's Motion for Entry of an Order (A) Authorizing, but not Directing, the Payment of Certain Prepetition Taxes, and (B) Granting Related Relief (the "Tax Motion").**

71.      In the Tax Motion, the Debtor requests authority, but not direction, remit and pay certain accrued and outstanding prepetition Taxes and Fees in the ordinary course of business, including those obligations subsequently determined upon audit or otherwise to be owed for prepetition periods, and (b) granting related relief.  Additionally, the Debtor seek authorization for all banks and financial institutions (collectively, the "Banks") to receive, process, honor, and pay checks or electronic transfers used by the Debtor to pay the foregoing and to rely on the representations of the Debtor as to which checks are issued and authorized to be paid in accordance with the Tax Motion.

72.      In the ordinary course of business, the Debtor collects, incurs, and pays, among other taxes, sales taxes, use taxes, annual report and licensing fees, personal property taxes, franchise taxes and fees, foreign taxes, and various other governmental taxes, fees, and assessments (collectively, the "Taxes and Fees").  The Debtor remits the Taxes and Fees to various federal, state, local, and foreign governmental units, including taxing authorities (collectively, the "Governmental Authorities").  Taxes and Fees are remitted and paid by the Debtor through checks and electronic transfers that are processed through the financial institutions at which the Debtor maintains the bank accounts that comprise its cash management system.  The Debtor estimates that approximately $475,000 in Taxes and Fees[13] outstanding as of the Petition Date or otherwise relating to the prepetition period are or will become due to the Governmental Authorities within thirty-seven (37) days after the Petition Date.

---

[13] This amount does not include tax obligations, such as real estate taxes, which are satisfied through the Debtor's payment of rent.

73.     The Debtor believes that failing to pay the Taxes and Fees could materially disrupt the Debtor's business operations in several ways.  *First*, failing to pay certain of the Taxes and Fees likely would cause the Debtor to lose its ability to conduct business in certain jurisdictions.  *Second*, the Governmental Authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtor's attention from the chapter 11 process.  *Third*, failing to pay Taxes and Fees could potentially subject certain of the Debtor's directors and officers to claims of personal liability, which likely would distract those key persons from their duties related to the Debtor's restructuring.  *Fourth*, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtor's business or the restructuring process. Moreover, the Debtor collects and holds certain outstanding tax liabilities in trust for the benefit of the applicable Governmental Authorities, and these funds may not constitute property of the Debtor's estate. Accordingly, the Debtor seeks authority, but not direction, to pay the Taxes and Fees in the ordinary course of business consistent with historic practice.

74.     I believe that the relief requested in the Tax Motion is in the best interest of the Debtor's estate, creditors, and other parties-in-interest, and will enable the Debtor to continue to operate its business during this Chapter 11 Case without disruption.  Accordingly, on behalf of the Debtor, I respectfully submit that the Tax Motion should be approved.

**F.      Debtor's Motion for Entry of an Order (A) Authorizing, but not Directing, the Debtor to Pay All Prepetition Trade and other Unimpaired Claims in the Ordinary Course of Business, (B) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders and (C) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "Vendor Motion")**

75.     In the Vendor Motion, the Debtor seeks an order (a) authorizing, but not directing, the Debtor to pay in full, in the ordinary course of business, allowed unimpaired prepetition

claims for goods or services related to the Debtor's operations and other ordinary course claims of creditors, including landlords and providers of services and vendors of goods ("Ordinary Course Claims"), (b) confirming the administrative expense priority status of orders placed with vendors for merchandise that will not be delivered until on or after the Petition Date (collectively, the "Prepetition Orders"), and (c) authorizing financial institutions to honor and process checks and transfers related to such obligations.

76.     The Debtor's retail business depends on the uninterrupted access to merchandise and other goods and services provided by the Debtor's network of Ordinary Course Creditors, including, most importantly, its vendors.  Moreover, the Debtor relies on the timely delivery of goods and services from its Ordinary Course Creditors to satisfy customer orders.  To convey the Debtor's support to a successful reorganization that includes continuing business relationships with the Ordinary Course Creditors, avoid any misperception that the Debtor will liquidate as other retailers have, and to ensure the timely delivery of goods and services from vendors, the Debtor seeks permission, but not direction, to pay the Ordinary Course Claims in the ordinary course of business.

77.     The Ordinary Course Claims are comprised of numerous fixed, liquidated and undisputed payment obligations the Debtor incurs to the Ordinary Course Creditors in the ordinary course of business.  For the twelve (12) months before the Petition Date, the Debtor's average monthly payments of Ordinary Course Claims were approximately $8.2 million.

78.     As of the Petition Date, the Debtor estimates that the total amount of prepetition Ordinary Course Claims outstanding is approximately $7.4 million.[14]  The Debtor estimates that

---

[14] A portion of the Ordinary Course Claims consists of amounts payable by the Debtor to the Parent for the purchase of Diesel brand goods.

approximately $6.2 million of the Ordinary Course Claims will become due and payable within the next thirty-seven (37) days in the ordinary course of the Debtor's business.  Accordingly, the Debtor seeks authority to pay such authority to pay all Ordinary Course Claims in full, in the ordinary course of business and subject to the terms and conditions set forth in the Vendor Motion.

14.    Under the Plan, the legal, equitable and contractual rights of all general unsecured claims are unimpaired to avoid disruption to the normal operations of the Debtor's business.  For these reasons, under the circumstances of this cases and the terms of the Plan, the relief requested herein will not prejudice any other party in interest.  Indeed, the relief requested herein seeks to alter only the timing, not the amount or priority, of the payment of the Ordinary Course Claims.

79.    Accordingly, I believe that granting the relief requested in the Vendor Motion is a sound exercise of the Debtor's business judgment and is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest.

**G.    Motion For Entry of an Order Authorizing Debtor to Honor and Continue Certain Customer Programs and Customer Obligations in the Ordinary Course of Business (the "Customer Programs Motion").**

80.    Pursuant to the Customer Programs Motion, the Debtor seeks entry of an order authorizing the Debtor to honor and continue its customer programs in the ordinary course of the Debtor's business.  The customer programs include (a) gift cards and (b) programs for returns, refunds, and adjustments.

81.    Prior to the Petition Date, in the ordinary course of business, the Debtor sold prepaid gift cards ("Gift Cards") that can be redeemed to purchase goods from the Debtor (the "Gift Card Program") at its retail and outlet locations.  The Gift Cards are a valuable generator of revenue for the Debtor. The Debtor generated approximately $400,000 in revenue from Gift Card sales in fiscal year 2018.  As of the Petition Date, approximately $600,000 in issued Gift

Cards are outstanding.  Given that the Gift Cards do not expire, the Debtor believes that, as of the Petition Date, many customers have not yet redeemed their Gift Cards.  In order to preserve the Debtor's goodwill with customers and preserve the integrity of the Debtor's brand, I believe the Debtor's failure to honor these obligations would tarnish the Debtor's reputation and would cause a decline in future sales.  Accordingly, the Debtor seeks the authority, but not direction, to continue to honor the Gift Cards in the ordinary course of business during the administration of this chapter 11 case, whether purchased before or after the Petition Date, consistent with past practices.

82.    Additionally, the Debtor seeks authorization to continue to pay Givex Corporation ("Givex") in the ordinary course of the Debtor's business and to any amounts which may be due to Givex for prepetition goods and services.  The Debtor pays Givex Corporation approximately $2,000 per month in exchange for managing and supporting the Debtor's Gift Card program.

83.    With respect to the Debtor's returns and refund program, certain customers may hold contingent claims against the Debtor for refunds, returns, exchanges, substitutions, issuance of store credit, price adjustments (including sales price adjustments to billing) and other credit balances (collectively, the "Return/Refund Program") relating to goods sold to customers in the ordinary course of business prior to the Petition Date.  Subject to certain restrictions and requirements, customers have thirty (30) days to return goods purchased from the Debtor's retail and outlet stores and on the Debtor's website. In addition, the Debtor typically issues refunds in the ordinary course of business for damaged or faulty goods ("Refunds").  As of the Petition Date, estimating the aggregate amount of potential refunds and returns owed is difficult due to the customers' individualized reasons and need for returning merchandise.  Nevertheless, I believe the ability to continue to provide the Return/Refund Program is vital to the Debtor's

ongoing relationship with its customers.  Accordingly, the Debtor seeks authorization, but not direction, to continue, in its discretion, to honor the Return/Refund Program in the ordinary course of business during the administration of this chapter 11 case, whether related to purchases made before or after the Petition Date.

84.     Accordingly, I believe that granting the relief requested in the Customer Programs Motion is a sound exercise of the Debtor's business judgment and is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest.

**H.    Debtor's Motion Authorizing (A) Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course Of Business in Connection with, Various Insurance Policies, Including Payment of Policy Premiums and Broker Fees, and (B) Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto (the "Insurance Motion").**

85.     The Debtor requests authority to: (a) to maintain the Insurance Policies (as defined below) without interruption, and to renew, supplement, modify, or extend (including through obtaining "tail" coverage) the Insurance Policies, or enter into new insurance policies, as needed in the ordinary course of business, and (b) honor all of their prepetition and postpetition Insurance Obligations (as defined below), under and in connection with the Insurance Policies on an uninterrupted basis and in the ordinary course of business during the administration of this chapter 11 case.  Additionally, the Debtor seek authorization for all banks and financial institutions (collectively, the "Banks") to receive, process, honor, and pay checks or electronic transfers used by the Debtor to pay the foregoing and to rely on the representations of the Debtor as to which checks are issued and authorized to be paid in accordance with the Insurance Motion.

86.     In the ordinary course of its business, the Debtor maintains flood liability, auto liability, marine cargo, Workers' Compensation and Employers' Liability, general liability, fiduciary liability, business travel accidents, kidnapping and ransom, umbrella and excess liability, and crime liability, and various other insurance programs through several different

insurance carriers (collectively, the "Insurers") under the insurance contracts (collectively, the "Insurance Policies") listed on Exhibit B annexed to the Insurance Motion. Under the Insurance Policies, the Debtor is required to pay premiums based on fixed rates set by the Insurers. The Debtor incurs a total of approximately $250,000 in the aggregate in annual premiums for the Insurance Policies (the "Insurance Obligations"). In addition, the Debtor employs AON Risk Services Northeast Inc. and Mogil Insurance Organization LLC as their insurance brokers (the "Brokers") to assist them with the procurement and negotiation of the Insurance Policies. The Brokers receives compensation (the "Broker Fees") from the Debtor pursuant to agreements entered into between the Brokers and the Debtor.

87.     The Debtor's Insurance Policies are essential to the preservation of the value of the Debtor's business, property, and assets. Accordingly, I believe that the relief requested in the Insurance Motion is in the best interest of the Debtor's estate, creditors, and other parties-in-interest, and will enable the Debtor to continue to operate its business during this Chapter 11 Case without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Insurance Motion should be approved.

I.     **Debtor's Motion for Entry of an Order (A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (B) Determining Adequate Assurance of Payment for Future Utility Services, and (C) Granting Related Relief (the "Utilities Motion").**

88.     By this motion, the Debtor seeks entry of an order (a) prohibiting utility providers from altering, refusing, or discontinuing services, (b) determining adequate assurance of payment for future utility services, and granting related relief.

89.     In the ordinary course of its business, the Debtor contracts with and relies upon a number of different kinds of utilities, including, among others, electricity, water, sewer service, gas, and waste disposal. Preserving Utility Services on an uninterrupted basis is essential to the

Debtor's operations. The Debtor's business includes retail stores and a corporate office. These locations require electricity, telecommunications, internet, water, waste management (including sewer and trash), and other Utility Services to operate.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtor's business operations would be disrupted, and such disruption could jeopardize the Debtor's ability to continue to operate the business at such location or administer its chapter 11 case. Any such disruption could adversely affect customer goodwill and employee relations, which, in turn, could negatively affect the Debtor's revenues. Accordingly, it is essential that the Utility Services continue uninterrupted during the chapter 11 case.

90.    Historically, the Debtor has a good payment record with the Utility Providers.  To the best of the Debtor's knowledge, there are no defaults or arrearages of any significance for the Debtor's undisputed invoices for prepetition Utility Services, other than payment interruptions that may be caused by the commencement of this chapter 11 case.  Furthermore, prior to the filing of this chapter 11 case, the Debtor prepaid all, or substantially all, of its Utility Providers for the month of March.  Based on their monthly average for the twelve months prior to the Petition Date, the Debtor estimates that its cost of Utility Services for the next thirty days will be approximately $60,000.

91.    To provide additional assurance of payment, the Debtor proposes to segregate $60,000 on its books and records (the "Adequate Assurance Deposit") for the benefit of the Utility Providers (the "Adequate Assurance Account").  The Adequate Assurance Deposit represents an amount equal to approximately one month of the Debtor's average cost of Utility Services, calculated based on the Debtor's average utility expenses over a twelve month period, which is representative of the Debtor's ongoing obligations.  The Adequate Assurance Deposit

will be held in the Debtor's "Concentration Account"[15] for the duration of this chapter 11 case and may be applied to any postpetition defaults in payment to the Utility Providers. The Adequate Assurance Deposit will be held by the Debtor; no liens will encumber the Adequate Assurance Deposit or the Adequate Assurance Account. The Debtor submits that the Adequate Assurance Deposit, combined with the Debtor's prepayment to Utility Providers for the month of March, the Debtor seeking a hearing on confirmation of the Plan thirty-five (35) days from the Petition Date, and the Debtor's ability to pay for future Utility Services in accordance with its prepetition practices (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of section 366 of the Bankruptcy Code.

92.     Accordingly, I believe the relief requested is necessary and appropriate and is in the best interests of the Debtor's estate, creditors, and other parties-in-interest.

---

[15] As defined in the *Debtor's Motion for an Order Pursuant to Sections 105(a), 345(b), 363(c) and 364(a) of the Bankruptcy Code Authorizing the Debtor to (I) Continue to use Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Waive  Requirements of Section 345(b) of the Bankruptcy Code* which has been filed concurrently with the Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: March 5, 2019
New York, New York

Mark G. Samson